FILED & JUDGMENT ENTERED
Steven T. Salata

May  4  2022

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

In re:

**SHAILESH PATEL**
**MEENA PATEL,**

               Debtors.

Chapter 11
Case No. 20-30455

## MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION AND DISMISSING CASE

**THIS MATTER** is before the court on the Debtors' Amended Plan of Reorganization (the "Amended Plan"), the Small Business Administration's (the "SBA") Objection to Confirmation of Debtors' First Amendment to Amended Plan (the "Confirmation Objection"), the SBA's Motion to Dismiss (the "Motion to Dismiss"), the Debtors' Motion to Disallow Claim of Small Business Administration (the "Claim Objection"), and the competing Motions for Summary Judgment on the Claim Objection filed by the SBA and the Debtors. A hearing on the Confirmation Objection and the Motion to Dismiss were held on March 17, 2022. The Claim Objection was previously heard on December 15, 2021 (the "December 15 Hearing"), but a ruling was deferred until these other matters could be heard. The attorney for the Debtors, the United States Attorney representing the SBA, the Subchapter V Trustee, and the Bankruptcy Administrator noted appearances. For the reasons set forth below, the court denies confirmation of the Amended Plan and grants the

Motion to Dismiss. The dismissal of the case moots the Claim Objection and motions for summary judgment.

## BACKGROUND

**I. The SBA Loan and Events Leading to Bankruptcy**

The dispute leading to this bankruptcy started over twenty years ago with a small business loan for a hotel. On December 2, 2020, the Debtors and five other people guaranteed payment to the SBA of a government backed mortgage loan from Charlotte Certified Development Corporation ("CCDC") to Unicorn Group Seven LLC ("Unicorn Seven") in the original amount of $1,000,000 (the "SBA Loan"). The Debtors were passive investors in the project. The other investors, including the person who would run the hotel, were friends and family of the Debtors. Unicorn Seven's real property in Mecklenburg County secured the SBA Loan, which was second in priority to First Charter National Bank's ("First Charter") deed of trust.

Due to 9/11 and the lack of tourism, the hotel business struggled from the start, and Unicorn Seven ultimately defaulted on its obligations to its lenders. General Electric Capital Corporation ("General Electric"), as the successor by assignment to First Charter, filed a notice of foreclosure on November 4, 2004, and the mortgaged property was sold to an affiliate of General Electric by a credit bid of $2,500,000. The foreclosure left the SBA with a deficiency claim for the entire balance of its loan. One month later, the SBA sent Unicorn Seven and the guarantors, including the Debtors, default notices. The default notices alleged that Unicorn Seven and the guarantors owed $960,223.02 in principal and $112,914.07 in interest on the SBA Loan.

In late November 2005, the SBA, the Debtors, and five other guarantors entered into a tolling agreement with the SBA, tolling the applicable statute of limitations through January 6, 2006. This agreement was not extended. In June 2006, The Debtors and three other guarantors

2

circulated a draft settlement agreement as to how the debt of the SBA Loan would be paid; however, the settlement agreement was never executed. Thereafter, one of the guarantors passed away, another retired, and two others moved to India.

In 2012, nearly six years later, the SBA transferred its loan to the United States Treasury Department for collection (the "Treasury"), and the Treasury started garnishing the male Debtor's wages to recover the SBA Loan. In response to this, the Debtors hired counsel in 2014 to challenge the garnishment.

In 2012, Debtors' counsel had previously successfully represented another guarantor of the SBA Loan in an administrative hearing with the SBA. That administrative hearing resulted in the SBA discontinuing the wage garnishment against the other guarantor since the SBA's records showed that the SBA Loan was marked "Paid in Full."

The male Debtor's administrative hearing in 2016 yielded the opposite result. Disagreeing with that prior ruling, the SBA hearing officer held that the male Debtor was liable to the SBA for the entire SBA Loan, which by then had a balance of $1,669,068.87 as of January 5, 2016. As a result, the SBA could continue garnishing his wages. The male Debtor had the right to challenge that ruling in U.S. District Court under the Administrative Procedures Act (the "APA"), but he did not.

Shortly after this decision (the "Garnishment Decision"), the Treasury began garnishing the female Debtor's wages as well. The SBA never took any other enforcement action against the Debtors other than garnishment. At this point, and with the statute of limitations for suing on the debt having expired, the SBA's only available remedies to collect its debt would be a) to make an administrative offset against tax refunds or b) to garnish the Debtors' wages in an amount not to

3

exceed 15% of their disposable income pursuant to 31 U.S.C. § 3720D(b)(1). These remedies have no applicable statute of limitations under 28 U.S.C § 2415(i).

Subsequent efforts by the Debtors to obtain a consensual reduction of the SBA Loan were unsuccessful. The Debtors then commenced this Chapter 11 case on April 23, 2020, purportedly to negotiate with the SBA. Thereafter, the SBA filed a proof of claim in the amount of $1,766,712.47 (the "SBA Claim"), which included interest through the petition date. The Debtors later redesignated their case as a Subchapter V case pursuant to an order entered on July 17, 2020.

## II.  The Debtors' Financial Position

The Debtors' schedules and the evidence produced in this case reveal that the Patels are not people that typically would file for bankruptcy, particularly under Chapter 11. The Debtors are both high-income wage earners and do not own a business. When the case was filed, the male Debtor was employed by IBM, and he now works for Cognizant in IT sales. The female Debtor works as a nurse for a plastic surgeon. The Debtors currently have a combined monthly income of $28,174.30 and a disposable income of approximately $20,874 per month.

The Debtors have a luxurious lifestyle and high living expenses, and there is no evidence that the Debtors plan on changing their spending habits. In January of 2022, the Debtors spent over $1,100 on food for just a two-person household. That same month, clothing and laundry costs exceeded $1,100 per month, transportation costs exceeded $1,300 per month, and entertainment costs exceeded $400 per month. The Debtors are not just paying their mortgage but are also making additional monthly principal payments by which to retire the debt in less than the contract period. The Debtors have continued this practice during bankruptcy. Their total monthly payment on their mortgage is $4,652. Additionally, the Debtors are spending $1,430 per month on homeowner's association fees. While in bankruptcy, the Debtors took several trips, including to

4

Malta, Chicago, and Memphis, and spent several thousand dollars in flights and hotels. Credit and debit card bills show purchases of high-end, name brand luxury clothing, as well as meals costing over $250 at restaurants. Moreover, the Debtors provided over $80,000 to family members as gifts just prior to filing their bankruptcy petition. The Debtors' total spending per month is approximately $12,252.87, and, despite this, the Debtors are still netting approximately $7,226.73 per month.

In addition to their high disposable income, the Debtors have significant assets totaling over $2,435,000. They own a five-bedroom, five-bathroom home with a three-car garage and gazebo on Mount Island Lake with a scheduled value of $900,000 and an appraised value of $1,240,000. The mortgage balance on the home was $389,617 on the petition date, and the Debtors have approximately $850,383 of equity in their home. The Debtors own four cars and a boat totaling $31,700 in value. The male Debtor holds a 401(k)-account with $765,766, and the female Debtor holds a 401(k)-account with $167,704. Their total personal property is worth over $1,523,000, and they have $251,336.27 in liquid assets. As to their liabilities, the Debtors are current on their mortgage and all other secured claims. Their only unsecured debt on the petition date, other than the SBA Loan, was $6,571 of credit card debt, which the Debtors admitted that they had the ability to pay.

**III.  Procedural History of Case**

As previously noted, the Debtors claim to have filed this case primarily to negotiate a reduction of their debt with the SBA. The Debtors filed their first Chapter 11 Small Business Plan on October 31, 2020. The Debtors then filed the Amended Plan on November 11, 2020, and in conjunction with the Amended Plan, the Debtors filed the Claim Objection on November 12, 2020.

The Amended Plan lists only one impaired class—the SBA. This means that the Amended Plan does not alter or effect any of the Debtors' other debts. As to SBA, the effects of the Amended Plan couldn't be more drastic: The Amended Plan essentially eliminates the SBA Claim pursuant to the pending Claim Objection.

As filed, the Claim Objection seeks to disallow the SBA Claim entirely. However, the Debtors' rationale for striking the claim has varied over the course of the case. The Debtors first argued that the SBA could not prove the balance of the SBA Claim and that it was unfair that the Debtors bore a disproportionate share of the SBA Claim as compared to the other guarantors. The United States (the "U.S."), on behalf of the SBA, objected to confirmation of the Amended Plan since the plan completely disallows the SBA Claim. The U.S. also filed a motion for summary judgment as to the Claim Objection on June 12, 2021. The Debtors subsequently stipulated to the amount of the SBA Claim, mooting their first argument. The Debtors later abandoned their second argument.

Next, the Debtors filed a supplement (the "Supplement") to the Claim Objection on August 13, 2021, still seeking to disallow the SBA Claim in its entirety. In the Supplement, the Debtors assert that the SBA is barred by 28 U.S.C. § 2415(a) from a legal action for money damages against the Debtors given that the applicable statute of limitations for suing on the SBA Claim passed on December 11, 2009. Generally, in bankruptcy, claims that are barred by an applicable statute of limitations are disallowed under 11 U.S.C. § 502(b)(1). Thus, the Debtors argue that the SBA claim should be disallowed entirely, notwithstanding the SBA's statutory ability to garnish the Debtors' wages. On November 3, 2021, the Debtors filed a motion for summary judgment as to their Supplement.

6

In responding to the Debtors' arguments, the SBA contends that the applicable statute of limitations does not terminate the SBA's administrative remedy; it only eliminates one potential remedy—filing a lawsuit. The SBA notes that Congress intended to adopt a broad definition of what constitutes a claim, See Johnson v. Home State Bank, 501 U.S. 78, 83 (1991), and the SBA's available administrative remedy—wage garnishment—is a right to payment and a legally enforceable obligation under 31 U.S.C. § 720D and 31 U.S.C. § 3716 respectively. Therefore, the SBA asserts that its claim should be allowed in its entirety.

After a number of continuances, in part due to illness of the participants, the Claim Objection and underlying motions for summary judgment were considered at the December 15 Hearing. The attorney for the Debtors, an attorney for the U.S., the Subchapter V Trustee, and the bankruptcy administrator noted appearances. At the December 15 Hearing, the court was concerned about the ramifications of the Claim Objection, which if sustained, would result in confirmation of a plan that affected no claims whatsoever. In addition, the court raised concerns about the Debtors' good faith in this case and whether the Debtors proposed their Amended Plan in good faith. Thus, the Claim Objection and related summary judgment motions were continued for ruling in conjunction with the pending Confirmation Objection.

After the December 15 hearing, the U.S. filed the Motion to Dismiss on December 22, 2001, seeking to dismiss the case as a bad faith filing. On January 7, 2022, the U.S. filed the supplemental objection to confirmation (the "Supplemental Objection") based on, among other grounds, the Amended Plan's feasibility, failure to apply all of the Debtors' projected disposable income to the Amended Plan, lack of an accepting impaired class, unfair discrimination of the SBA Claim, failure to provide appropriate remedies in cased of default, failure to provide more than the creditors would have received in a Chapter 7, and lack of good faith.

7

Likely in response to the court's concerns regarding good faith, the Debtors filed the First Amendment to Amended Plan (the "Plan Amendment") on March 7, 2022. The Plan Amendment extended the plan to three years and allowed the SBA Claim in the amount of $130,000— which, according to the Debtors, would be the present value of three years of prospective SBA wage garnishments. This marked the first time during the case, nearly two years after the case was filed, that the Debtors amended their plan to provide the SBA any repayment of its claim. The U.S. objected to the Plan Amendment, largely for the same reasons as in the Supplemental Objection.

The Motion to Dismiss, confirmation of the Amended Plan, the Claim Objection, and the underlying motions for summary judgment on the Claim Objection were heard on March 17, 2022. The facts of the case are not disputed, and the exhibits were admitted by stipulation of the parties. The parties agree that the amount of the SBA Loan is $1,766,712.47. At the hearing, the parties reiterated their positions and arguments in their pleadings.

## **DISCUSSION**

The primary issues before the court are a) whether the Debtors proposed the Amended Plan in good faith under 11 U.S.C. § 1129(a)(3) and b) whether this case should be dismissed for cause under 11 U.S.C. § 1112(b) due to a lack of good faith. To the extent necessary, the court will briefly address the pending Claim Objection and the SBA's standing in this case to contest confirmation and dismissal.

I. **Standing**

In light of the pending claim objection, there is a at least an academic question as to whether the SBA has standing to object to confirmation and seek dismissal of the case. Under 11 U.S.C. § 1109(b), "a party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue" in a Chapter 11 case. The SBA presently holds a debt and a legally

8

enforceable remedy in the form of wage garnishment. If the Debtors' plan were to be confirmed, the SBA would be unable to recover most of its claim and would lose the ability to garnish the Debtors' future wages or offset against their future tax refunds. The SBA is the only creditor or party in interest affected by the Debtors' plan. Therefore, the SBA does have standing to object to confirmation and seek dismissal of this case. Even if the SBA lacked standing and no other party in interest objected to confirmation, courts have an affirmative obligation to ensure that the elements of 1129(a) are met and have the ability to dismiss a case sua sponte under 11 U.S.C. § 105(a).

## II. Good Faith Standard under 1129(a)(3)

11 U.S.C. § 1191(a) states that any plan confirmed under Subchapter V of Chapter 11 must meet all the requirements of 1129(a), other than paragraph 15 of that section. Under § 1129(a)(3), the court can only confirm a plan if "[t]he plan has been proposed in good faith and not by any means forbidden by law." "Good faith" is not defined by the Code; however, "[i]t is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result which is consistent with the objectives and purposes of the Bankruptcy Code." In re Renegade Holdings, Inc., 429 B.R. 502, 518 (Bankr. M.D.N.C. 2010) (citations omitted). The two recognized policies of Chapter 11 are "preserving going concerns" and "maximizing property available to satisfy creditors." See Bank of America Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 435 (1999). Since this is an individual Chapter 11 case, there is at least one more potential bankruptcy purpose in this case: providing the Debtors a fresh start. When determining whether there is good faith, courts consider the "totality of the circumstances surrounding the proposed plan." In re Eagan, No. 12-30525, 2013 WL 237812, at *4 (Bankr. W.D.N.C. Jan. 22, 2013) (citing Renegade Holdings, 429 B.R. at 519 (citations omitted)). The

9

burden of establishing good faith is on the debtor and must be satisfied by a preponderance of the evidence.  See In re Faison, 556 B.R. 728, 737 (Bankr. E.D.N.C. 2016) (citing In re Danny Thomas Props. II Ltd. P'ship, 241 F.3d 959, 963 (8th Cir. 2001)).

**III.  Good Faith Standard under 1112(b)**

11 U.S.C. § 1112(b) provides that a court may convert a case to Chapter 7 or dismiss a case for cause.  See Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989) (citing 11 U.S.C. § 1112(b)).  Courts, including the Fourth Circuit, have broadly interpreted the language of 1112(b) to include a lack of good faith as a cause for dismissal.  See Carolin, 886 F.2d at 699 (citing Albany Partners, Ltd. v. W.P. Westbrook, Jr., et al. (In re Albany Partners, Ltd.), 749 F.2d 670, 674 (11th Cir. 1984)).  Moreover, a good faith requirement is implicit "in light of established policy considerations."  Carolin, 886 F.2d at 698.  As the Fourth Circuit has stated, a good faith inquiry:

> prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes. Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshalling and turnover of assets) available only to those debtors and creditors with "clean hands."

Id. (quoting Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986)).

In the Fourth Circuit, a lack of good faith requires a showing of (1) objective futility and (2) subjective bad faith.  See Carolin, 886 F.2d at 700–01.  The objective futility prong focuses on "whether there is no going concern to preserve ... and ... no hope of rehabilitation."  Id. at 701 (quoting Little Creek, 779 F.2d at 1073).  The subjective bad faith prong focuses on whether a debtor "is motivated by an honest intent to effectuate reorganization or is instead motivated by some improper purpose."  In re Premier Auto. Servs., Inc., 492 F.3d 274, 280 (4th Cir. 2007) (citing Carolin, 886 F.2d at 702)).

The standard in Carolin is used to determine whether the Debtor filed the case in good faith and subject to dismissal at the *outset* of the case. See id. at 700. As the court in Carolin reasoned, "[d]ecisions denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, are inherently drastic and not lightly to be made." Id. This case presents a different question—dismissal at confirmation after a case has played out, and a debtor's intentions and the facts of a case have been revealed. As a result, the stringent two-prong dismissal standard may not apply to the present case. Instead, this is potentially a situation where confirmation is not possible since the process itself is tainted by a debtor's bad faith, and the court may terminate the proceedings to prevent further abuse. See Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1395 (11th Cir. 1988). Regardless of whether the two-prong standard applies at confirmation or not, both the subjective bad faith and objective futility prongs are satisfied in this case as discussed in the next section.

Similar to the good faith test under 1129(a)(3), courts look to the "totality of circumstances" in determining whether to dismiss the case. Carolin, 886 F.2d at 701. There is no "single factor that will necessarily lead to a finding of bad faith." Id. (quoting Nat. Land Corp. v. Baker Farms, Inc. (In re Nat. Land Corp.), 825 F.2d 296, 298 (11th Cir. 1987)). There are several factors indicative of bad faith that are relevant to this case: using the bankruptcy system to avoid an obligation under circumstances in which the debtor is not in need of reorganization, See Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 162–64 (3d Cir. 1999), using the bankruptcy system as a litigation tactic to resolve a two-party dispute, See In re Crown Fin., Ltd., 183 B.R. 719, 722 (Bankr. M.D.N.C. 1995), and using the bankruptcy system to frustrate the rights of creditors, See Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828–29 (9th Cir. 1994).

11

Given that the "totality of the circumstances" test used in determining bad faith under both § 1129(a)(3) and § 1112(b) are similar, the court will address the facts supporting both denial of confirmation and dismissal in tandem. The court will also address both prongs of the Carolin standard in tandem, as evidence of one prong tends to prove evidence of the other, and vice versa. See Carolin, 886 F.2d at 701.

### IV. The Debtors' Lack of Good Faith

In the present case, the Debtors' proposed plan and reason for the filing of this case is not in line with any of the purposes of the Bankruptcy Code. The Debtors are both wage earners. The male Debtor works for Cognizant in IT sales, and the female Debtor works for a plastic surgeon as a nurse. Thus, the Debtors do not have a business to reorganize and there is no "going concern" to preserve.

The Debtors also do not require bankruptcy to preserve asset value for the benefit of creditors. The proposed plans in this case are evidence of this. The only impaired class in each iteration of the Debtors' proposed plans is the SBA. The other assets and liabilities of the Debtor remain unchanged. The Debtors are current on their mortgage[1] and all other secured claims. There was a small amount of credit card debt, but the Debtors admitted that they had the ability to pay this debt. The only affected liability is the debt to the SBA.

Moreover, the Debtors have substantial assets, including liquid assets of $251,336.27, most of which was accumulated during the pendency of this case while the SBA could not garnish their wages. They own four cars, a boat, personal property totaling over $1.5 million, and a well-maintained home with an appraised value of $1.24 million. Their total assets are over $2.435

---

[1] The Debtors are arguably ahead on their mortgage because they have been making additional principal payments each month.

12

million. With enough assets to continue to pay all liabilities,[2] the Debtors do not need bankruptcy to equitably distribute assets to other creditors.

Furthermore, the Debtors simply have no need for a fresh start. Without restructuring any of their current liabilities or significantly altering their current expenditures, the Debtors can pay the SBA wage garnishment. The Debtors are earning approximately $28,000 per month, have a disposable income of approximately $20,000, and despite high discretionary living expenses, are still netting a little over $7,000 per month. The $7,000 per month is more than enough to cover the SBA wage garnishment, which is equal to 15% of the Debtors' disposable income. Even if the Debtors could not pay the garnishment, the Debtors likely could cut back on their luxurious lifestyle and spending habits, which include vacations, expensive meals at restaurants, and purchases of high-end clothing. However, the Amended Plan makes no attempt to cut back on spending, and there is no evidence suggesting that this is likely to change. The Debtors are not under any financial distress and do not need bankruptcy to obtain a fresh start. Rather, they seek to use bankruptcy to eliminate a debt that they do not want to pay.

Eliminating the SBA Claim is the only reason that the Debtors filed this case. The Debtors contend that the purpose of this case is to negotiate with the SBA,[3] but their conduct and proposed plans indicate otherwise. Their original proposed plan sought to disallow the SBA claim entirely and pay the Government nothing. The Debtors strenuously argued this position for almost two years, unsuccessfully floating theories of unfairness, laches, and now, that the debt is time barred

---

[2] This is true since the SBA can only collect its debt by administrative remedy.

[3] Even if this were true, there is no principled reason why the SBA should reduce its debt. It is simply something that the Debtors desire.

13

under 28 U.S.C. § 2415.  Throughout these two years, the Debtors were not attempting to negotiate with the SBA, but to cut off the SBA completely.

The apparent goal of this case continues to be to frustrate the rights of the SBA, not to reach a resolution.  Only after the December 15 Hearing, almost two years after the petition date, did the Debtors finally amend their plan to pay the SBA anything.  This was likely in response to the court's concerns regarding the Debtors' good faith.  Reading the tea leaves, the Debtors responded with a new plan variant that would pay the SBA the present value of the amount that the SBA could garnish over three years, as opposed to the maximum plan term length of five years.  That sum is $129,000—nowhere near the $1.7 million dollar claim the SBA is currently owed or what the SBA could garnish or offset from the Debtors outside of bankruptcy.

The Debtors' case is more akin to a two-party dispute with the SBA rather than a Chapter 11 reorganization.  The Debtors are attempting to use a bankruptcy tool, § 502 of the Code, to disallow the SBA debt entirely, or at the very least, use it as a coercive tactic to force the SBA to settle for substantially less than what it is owed.  If the Debtors had wished to challenge the legal merit of the Garnishment Decision, then they could have filed a lawsuit in district court under the APA.  Instead, and no doubt hoping to obtain a more favorable legal standard,[4] they alternatively chose to challenge this decision in bankruptcy court.

Bankruptcy courts have long held that two-party disputes are best left to the proper court.  See Crown Fin., Ltd., 183 B.R. at 723 ("Chapter 11 was not intended to provide an additional forum for the continuation of litigation over what is essentially a two-party dispute."); See also In re Harvey Probber, Inc., 44 B.R. 647, 650 (Bankr. D. Mass. 1984) ("[Chapter 11] clearly was not

---

[4] Pursuant to the APA, agency decisions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

14

intended as an alternate forum for private disputes that only involved the disputants for which there was a well established . . . forum."). This dispute is no different, and if the Debtors disagreed with the Garnishment Decision, they should have challenged it in the appropriate court.

In response to allegations of bad faith, the Debtors contend that using § 502 to disallow a claim is a proper bankruptcy purpose. The Debtors cite to the Coleman case in support of their argument. Coleman v. Cmty. Trust Bank (In re Coleman), 426 F.3d 719 (4th Cir. 2005). In Coleman, the debtor and her husband allowed a bank to put liens on two pieces of property in order to place the properties beyond the reach of the Federal Government in existing Chapter 11 cases of companies owned by the debtor and her husband. Id. The debtor subsequently filed for bankruptcy and filed an adversary proceeding against the bank to avoid the pre-petition liens as fraudulent transfers. Id. The Fourth Circuit rejected the argument that the debtor filed the case in bad faith and held that the avoidance of the liens under § 544 was a proper use of the Code since it afforded the debtor the chance to avoid the security interest, sell the properties, and pay her other creditors. Id. at 726–27.

This case is distinguishable from Coleman. Notably, unlike in Coleman, there are no other creditors in this case that would benefit from the disallowance of the SBA Claim. The Debtors are current on their mortgage and essentially have no other debts to pay off. In this case, the only party that would realize any benefit from disallowing the SBA claim is the Debtors. The Debtors confuse a bankruptcy tool for a proper bankruptcy purpose.

In summation, the totality of the circumstances demonstrate that the Debtors' plan is not consistent with the purposes of the bankruptcy code, and therefore, confirmation must be denied for lack of good faith under § 1129(a)(3). Furthermore, the Debtors have no proper purpose for remaining in this Chapter 11 case and have no honest intent to "effectuate a plan of

15

reorganization." Carolin, 886 F.2d at 702. Thus, cause exists to dismiss the case for lack of good faith pursuant to § 1112(b). As previously noted, the objective futility prong may not apply to this situation since this case has reached the confirmation stage. In any event, the objective futility prong is satisfied. The same evidence supporting a finding of subjective bad faith supports that there is "no hope of rehabilitation." Id. at 701. The Debtors in this case are intent on either eliminating the SBA Claim or paying as little of it as possible, even though they have the ability to pay the SBA wage garnishment. To date, and for good reason, the SBA has not accepted any of the Debtors' proposals or plan amendments and is unlikely to do so. Despite the court's encouragement to settle the case, after nearly two years, neither party has moved very far from their original positions. Therefore, at this point, there is no possibility of a reorganization plan. In conclusion, both prongs of the Carolin test are satisfied, and the Motion to Dismiss should be granted.

### V. The Claim Objection is Mooted by the Dismissal of the Case

Since the case is dismissed, there is no need to rule on the Claim Objection except to conclude that § 502 is being improperly used by the Debtors. The court notes the Kittrell case. In Kittrell, the court held that "filing a proof claim is tantamount to filing a complaint in a civil action," In re Kittrell, No. 11-80985C-13D, 2012 WL 369170, at *3 (Bankr. M.D.N.C. Feb. 3, 2012) (citations omitted), and a proof of claim in bankruptcy is subject to the statute of limitations to the same extent as a complaint is in a lawsuit. See id. (citation omitted). The court in Kittrell further stated that a proof of claim seeks payment from a debtor and does not involve administrative offset. See id.

The debtor in Kittrell, however, used § 502 and the claim objection process in support of a proper Bankruptcy purpose. As noted above, in bankruptcy, claim objections exist to support the

16

marshalling of scarce assets among competing creditors in order to ensure an equitable distribution of assets. Claim objections also aid in providing a debtor a fresh start. In the present case, the claim objection process is not necessary. There is only one major claim, resources are available to pay that claim, and the Debtors do not need a fresh start. Without a proper bankruptcy purpose, there is no need for the Debtors in this case to employ the claim objection process. Therefore, the matter is mooted by dismissal of the case.

## VI. Conclusion

Accordingly, the court hereby **DENIES** confirmation of the Amended Plan and **GRANTS** the Motion to Dismiss due to the Debtors' lack of good faith. The dismissal **MOOTS** the Claim Objection and the underlying motions for summary judgment filed by the Debtors and the SBA.

**SO ORDERED**.

This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of the Order.

United States Bankruptcy Court